**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

TIMOTHY TORBERT,

                Petitioner,                             Case Number: 05-CV-71543DT
                                                     Honorable Denise Page Hood

v.

MILLICENT WARREN,

                Respondent.
_____/

**OPINION AND ORDER DENYING PETITIONER'S PETITION FOR**
**WRIT OF HABEAS CORPUS**

       The Petitioner, Timothy Torbert, a state inmate currently incarcerated at the Thumb Correctional Facility in Lapeer, Michigan, has filed a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges his state convictions and sentences for (1) two counts of assault with intent to commit murder, MICH. COMP. LAWS 750.83, (2) two counts of assault with intent to do great bodily harm, MICH. COMP. LAWS 750.84, and (3) felony firearm, MICH. COMP. LAWS 750.227(B)(A). For the reasons stated, the Court denies the petition.

**I. Procedural History**

       Petitioner was tried before a jury in the Genesee County Circuit Court, the Honorable Archie L. Hayman, presiding. On September 22, 1995, he was sentenced to the following: concurrent terms of eight to fifteen years for the assaults with intent to do great bodily harm, twenty to forty years for the assaults with intent to murder, and a consecutive term of two years for the felony firearm conviction.

Petitioner appealed as of right to the Michigan Court of Appeals, alleging the following: (1) the verdict was against the great weight of the evidence, (2) jury voir dire error, (3) improper jury instructions, (4) prosecutorial misconduct, and (5) improper habitual sentencing. Petitioner also filed a motion to remand for an evidentiary hearing on the issue of whether the verdict was against the great weight of the evidence. The motion was granted and a hearing was held by the trial court on December 19, 1996.

On April 7, 1998, the Michigan Court of Appeals affirmed Petitioner's convictions. *People v. Torbert*, No. 191426 (Mich.Ct.App. April 7, 1998). Petitioner then filed a delayed application for leave to appeal with the Michigan Supreme Court, which was denied on March 30, 1999. *People v. Torbert*, 459 Mich. 962, 591 N.W.2d 38 (1999).

Subsequently, Petitioner filed a motion for relief from judgment pursuant to M.C.R. 6.500 *et. seq.* in the trial court. On November 18, 2002, the trial court denied the motion from the bench. The order was entered on November 21, 2002.

Petitioner then filed a delayed application for leave to appeal from that order with the Michigan Court of Appeals asserting the following claims: (1) denial of the right to present a defense, (2) denial of an investigator, (3) ineffective assistance of trial and appellate counsel, (4) unfair jury composition, and (5) improper denial of his motion for relief from judgment by the trial court. Petitioner also filed a motion to remand asking for an evidentiary hearing on the alleged ineffective assistance of counsel. On March 9, 2004, the Michigan Court of Appeals denied the motion for remand and denied leave. *People v. Torbert*, No. 251595 (Mich.Ct.App. March 9, 2004). Petitioner filed his application for leave to appeal in the Michigan Supreme

Court, which was denied on December 29, 2004. *People v. Torbert*, 471 Mich. 945, 690 N.W.2d 116 (2004). Petitioner filed the pending petition for a writ of habeas corpus on the first five grounds raised on direct appeal and the remaining six grounds raised on collateral review: (1) the verdict was against the great weight of the evidence, (2) jury voir dire error, (3) improper jury instructions, (4) prosecutorial misconduct, (5) improper habitual sentencing, (6) denial of the right to present a defense, (7) denial of an investigator, (8) ineffective assistance of trial counsel, (9) ineffective assistance of appellate counsel, (10) unfair jury composition, and (11) improper denial of his motion for relief from judgment by the trial court.

## II.  Substantive Facts

This case arises out of a police-foot chase that took place on May 7, 1995, in Flint, Michigan, between Petitioner and several police officers. Officer Ralph Tedford ("Tedford"), a police officer for six years, testified that on that date at approximately 2:37 a.m., as he was traveling northbound on Saginaw Street heading home from his part-time security job, he heard a call of shots being fired. He turned on his police radio and heard that the shots were allegedly coming from the Hammerdroppers bar on North Saginaw Street, an illegal after-hours club. Officer Tedford advised the dispatcher that he was in the area, and rolled down his windows. He could hear shots being fired, and saw cars moving back and forth. He testified that four lanes of traffic were completely backed up with cars. Officer Tedford then pulled into a church parking lot, got out of his car, and grabbed his bullet-proof vest and shotgun. The radio dispatcher described the alleged shooter to him; a man wearing a dark jacket, a blue and white shirt, and light-colored pants, standing by a Bonneville at the corner of Myrtle and Saginaw Streets.

3

Officer Tedford testified that he proceeded northbound on Saginaw Street, when the dispatcher advised that there was a man that was shot at 715 Carton Street.  One of the uniformed

cars advised the dispatcher that he would respond to Carton Street, so Officer Tedford advised dispatch that he would see if he could locate the man with the gun, who was allegedly near Hammerdroppers bar.

As Officer Tedford approached Myrtle Street, he saw a Bonneville with seven subjects standing by, one of whom fit the description given.  He advised dispatch that he saw the subject and that he would watch and wait until a uniformed car arrived.  Officer Tedford then saw the subject walk over to the Bonneville.  As the uniformed car pulled up, the subject took off running.  Officer Tedford identified the subject as the Petitioner in this case.

Officer Tedford exited his car and chased Petitioner, along with Officer Sidney Booth ("Booth"), who was in uniform.  As they were running, Petitioner crouched over slightly, and Officer Tedford was able to see that he had a pistol in his hand.  He yelled out that they were police and requested that he drop his gun.  Petitioner however continued to run.

As Petitioner reached the corner of Damon and Saginaw Streets, which is one block north of Myrtle Street, he mumbled something which Officer Tedford could not understand.  Petitioner then allegedly extended his right hand, turned around, and fired a shot.  At that time, Officer Tedford did not have a clear shot at Petitioner because there were people still on the sidewalk.  Petitioner continued to run, and as he reached the center of Damon Street, Officer Tedford heard him say, "Fuck it, I don't care, you'all just gonna have to shoot me."  (Trial Tr. vol. II, 39, Sept. 19, 1995).  According to Officer Tedford's testimony, Petitioner then turned around and fired

4

another shot in the direction of the police officers.  Officer Tedford attempted to shoot back, but his safety was on and his gun did not go off.

It is Officer Tedford's testimony that Petitioner then came to a fence, climbed to the top of the fence, turned back and fired a shot back toward the officers.  Petitioner ran up a hill and extended his right hand, and as he started to turn around, Officer Tedford fired his gun at him. Petitioner fell to his knees and two other officers were then able to secure him.

Officer Sidney Booth's ("Booth") testimony corroborated that of Officer Tedford.  He testified that on that same date at 3:25 a.m., he was on duty, when he and his partner, Officer Clifford Hooker ("Hooker"), overheard a dispatch call regarding shots fired around Carton Street near the Hammerdroppers Club on North Saginaw in Flint, Michigan.  They responded to the call, but did not locate anyone who had been shot.  Officer Tedford then informed them that he saw a subject matching the dispatcher's description around Hannerdroppers Club.  The officers then went to that location.

Officers Booth and Hooker saw the subject and got out of their car with their guns drawn. The subject began running.  Officer Booth ran after him.  When the subject got to the corner of Damon and Saginaw, he turned and pointed his gun toward the officers and fired two shots.

After the subject fired the shots, Officer Booth saw two officers, in the area where the subject shot, chasing him.  These officers were Scott McKenna ("McKenna") and Denny VanAlstine ("VanAlstine").  The officers saw that the subject had a chrome handgun.  The subject continued to run down Damon Street, turned around and said, "you motherfuckers got to kill me, you motherfuckers got to kill me."  (Trial Tr. vol. II, 104, Sept. 19, 1995).  The subject then pointed the gun towards Officer Tedford and the two other officers and fired two more

5

shots.  There was no doubt in Officer Tedford's mind that the subject was shooting at him.

Officer Booth then testified that he saw the subject jump a fence and then heard two shots fired.  He testified that he was not sure if these shots were from the subject or from the other officers.  Officer Booth testified that he did not see the subject fire any shots from the top of the fence, but he could have, as he did not know if the two shots he heard were from the subject or not.  It was Officer Booth's testimony that the subject then hit the ground, got up, and tried to run again.  At that time, Officer Booth heard another gun blast, and he saw the subject fall.  Officers McKenna and VanAlstine then climbed the fence, placed the subject (Petitioner) in custody, and secured his gun.

Officer Hooker's testimony also corroborated that of the other officers involved.  He testified that he was on duty on that date, working in uniform, as Officer Booth's partner.  He said that they went to the 715 East Carton address regarding a call from dispatch about a shooting.  They however did not find anything at that address.  They then heard over the police radio that the suspect was near Myrtle and Saginaw street; so, they went to that area.

Officer Hooker testified that they got out of the police car with guns, and Officer Booth told three individuals, who were standing in the area to put their hands up.  One of the subjects, Petitioner, took off running.  Officer Booth gave chase on foot, while he (Hooker) got in the cruiser and gave chase.  Officer Hooker testified that he heard two shots being fired.  When he got into the 600 block of East Damon Street, he saw that Officers McKenna and VanAlstine had the subject in custody.

Sergeant Paul Dieterle testified that on that same date at around 3:30 a.m., he was on duty and was dispatched to the Hammerdroppers Club.  He saw a person matching the

6

description that was given out by police dispatch as the suspect in the shooting.  He saw the

subject running and being pursued by Officers Tedford and Booth.  The subject ran right past

him, and Sergeant Dieterle could see that he had a handgun in his right hand.  Sergeant Dieterle

began driving backwards to keep the suspect in his view.  He saw the township officers get out

of their car and run towards the suspect.  He saw the suspect then turn and fire the gun.  The gun

was aimed towards the township officers.  As Sergeant Dieterle proceeded on Damon Street, he

heard more shots being fired.  He lost sight of the suspect and heard two or three more shots and

then a "louder report," which he considered to be a shotgun blast.

     Sergeant Dieterle arrived on the scene and saw Petitioner was in custody.  He testified

that Petitioner made a statement to him, saying, "Man, I'm sorry, I didn't mean to do it, I didn't

mean to do it." (Trial Tr. vol. III, 19, Sept. 20, 1995).  Defense counsel questioned Sergeant

Dieterle about a statement he gave to Sergeant Middleton, where Sergeant Middleton reported

that Sergeant Dieterle said Petitioner said, "I don't why I did it, I don't why I did it, it was

stupid."  (Trial Tr. vol. III, 22, Sept. 20, 1995).  Sergeant Dieterle testified that was not what he

recalled Petitioner saying.

     Officer McKenna testified that he was on duty on May 7, 1995, working as a partner to

Officer VanAlstine.  They responded to a call regarding shots fired at Hammerdroppers.

Dispatch gave a description of the suspect.  Officer McKenna saw the subject fitting the

description running.  He saw Officer Booth chasing him.  Officer McKenna got of the car and

tried to cut the subject off so that he could tackle him.  He heard Officer VanAlstine yell that the

subject had a gun, but he (McKenna) did not see one.  When Officer McKenna was about eight

to ten feet south of the subject, he saw him reach into his belt area and pull out a revolver.  The

7

subject said, "Kill me, kill me, mother fucker, because I'm going to kill you."  (Trial Tr. vol. III, 30, Sept. 20, 1995).  The subject continued running and Officer McKenna followed, shouting for him to drop the gun.  The subject kept saying that he didn't care.

Officer McKenna testified that he then saw the subject slow down and start to turn toward him and his partner and saw him "draw down" and fire one round out of the gun.  He explained that to "draw down" is where someone is not just waiving a gun around, they are actually bringing the gun down and pointing it.

There were many people on the sidewalk in the area and Officer McKenna kept yelling for him to drop the gun.  Immediately after the shot was fired, the subject again made the statement, "you're going to have to kill me, mother fucker, or I'm going to have to kill you." (Trial Tr. vol. III, 30, Sept. 20, 1995).  He then spun "more to the right" and made eye contact with Officer McKenna and discharged another shot toward him.  The subject was approximately eight to ten feet from Officer McKenna when he shot toward him.  Officer McKenna testified that the subject did not point the gun at the ground, nor up in the air.  Rather, he leveled the gun at him and made eye contact.  The subject continued running, repeating "I don't care" over and over.  On Damon Street, the subject turned around and again made the statement, "You mother fucker, you're going to have to kill me or I'm going to kill you."  (Trial Tr. vol. III, 35, Sept. 20, 1995).  At that point Officer McKenna and his partner came together, chasing the defendant.

Petitioner then fired another shot at Officer McKenna and his partner.  He climbed up a fence, and fired another shot.  Petitioner fell over the top of the fence and made a statement as he hit the ground that he was going to kill him.  He got up and started to run, turning to his right side.  Officer McKenna knew that his partner was climbing the fence and believed that Petitioner

8

was drawing down on his partner.  He then heard a large, loud blast which sounded like a

shotgun.  Petitioner continued to turn to his right and Officer McKenna fired two rounds from

his duty weapon.  Petitioner began to "wobble and scream" and fell over backwards.  Officer

VanAlstine kept yelling for him to drop the gun.  Petitioner then threw the gun, and the officers

took him into custody.  It was determined that Petitioner had not been hit.

      Alghandi Phillips, a witness to the incident, testified that he was passing in front of

Hammerdroppers' Club on May 7, 1995 at 3:00 a.m. or so.  He saw a person (not Petitioner) fire

shots and radioed on his police service radio that shots were being fired at the club.  Mr. Phillips

is a city officer with the Downtown Development Authorities, but was not on duty at the time.

He then lost sight of that person.

      Mr. Phillips saw Petitioner knocking the back window out of a Corsica with occupants

inside.  He testified that it was obvious that the Corsica had hit a Bonneville.  It was Mr. Phillips

testimony that Petitioner was hitting and kicking other cars, and pulled a gun out and was

pointing it at people in their cars.  Mr. Phillips then radioed for the police and gave a description

of Petitioner.  He approached Petitioner, who saw Mr. Phillips' radio.  He pushed him and began

running.  Mr. Phillips said that he then saw the police follow him in a chase.  He followed behind

the chase, and heard a shot.  He saw Petitioner climbing a fence, and turning around and

shooting.  Mr. Phillips testified that he saw Petitioner jump over the fence and fall, get up and

then he "took a couple of steps and then turned around and that's when I heard numerous shots."

(Trial Tr. vol. III, 89, Sept. 20, 1995).  Mr. Phillips did not know who was shooting.

      Officer VanAlstine testified that he was working on the day in question, and central

communications advised him and his partner of a man with a gun.  They gave a description.

Both officers arrived at the scene and saw the subject, matching the description.  He had a gun and was running.  Officer VanAlstine saw the gun in his front waistband area.  He testified, "When he [Petitioner] got to the corner of Damon and Saginaw, the subject had the gun in his right hand, he stopped, turned, extended his right arm with the gun in his hand, and looked at me and fired one round.  And then I flinched or whatever went down in this, and saw the subject continue to the right and fired another shot again."  (Trial Tr. vol. III, 111, Sept. 20, 1995).

Officer VanAlstine testified that he continuously told the subject to drop the gun and the subject responded "you're going to have to fucking kill me because I'm going to fucking kill you."  (Trial Tr. vol. III 112, Sept. 20, 1995).  The subject then leveled the gun at him again and fired another round.

Officer VanAlstine's testimony corroborated that of the other officers.  He said that at that point the subject began to run and the officers chased him.  The officers and the subject then came upon a fence, which the subject began climbing.  When he reached the top, he turned and fired a shot at Officer VanAlstine.  The subject fell to the ground, and Officer VanAlstine said that he then began climbing the fence.  The subject started to turn with the gun pointed toward him and the other officers.  Officer VanAlstine heard one loud shot and two quick rounds fired and then saw the subject fall.  The subject, identified as Petitioner in this case, was placed in custody.  He told the officers at that time that he didn't mean to do it and started vomiting.

Officer Terry Demons testified that he too responded to the call.  When he arrived he saw someone running.  He pulled a chrome revolver out of his waistband, and joined in the pursuit. He then heard two shots being fired, but could not tell who was doing the shooting.  He heard someone yell "drop the gun," and heard a reply of something like, "I don't give a fuck, I'll kill

10

you, you're gonna have to kill me, I want to die anyway." (Trial Tr. vol. IV, 8, Sept. 21, 1995). He saw someone pointing a gun in the direction of the officers and heard a shot. He saw the subject climbing a fence and firing another round as he rolled over the fence. When the subject got to the other side of the fence, the officers fired.

Sergeant Lee Black, the officer in charge of this case, testified that she retrieved the gun and found five live rounds and four expended rounds in the gun.

Petitioner testified. He said that on that particular night he went to Hammerdroppers with a girl named Tosha. While there, he heard shots. He grabbed his gun and put it in his waistband. He said he did that for his protection. Then, he saw a car hit his car so he jumped up and was yelling at them to stop tearing his door off, but they wouldn't stop. Because he was so angry, he broke the back windshield out of their car with his fists. He then realized that he knew the people in the car and they "apologized and I hugged them." (Trial Tr. vol. V, 25, Sept. 22, 1995).

On his way back to his car, he heard another shot. He took out his gun and fired once into the air "just to, you know, get away from me with that, you know, shooting." (Trial Tr. vol. V, 26, Sept. 22, 1995). Petitioner testified that then, at that point, Alghandi Phillips approached him and tried to put his arm around him. When Phillips did that, he saw his walkie-talkie. He thought he was the police. Petitioner said that he pushed Phillips' arm off of him and ran. His gun was falling out of his waistband as he ran, so he grabbed it and put it in his hand. He testified, "I realized I had -- you know, I didn't realize I had put my finger to the trigger. And at that point, before I even reached the corner at Damon Street, before I even turned that corner or reached it, the gun hit off accidently twice, it was two quick shots." (Trial Tr. vol. V, 27-28,

11

Sept, 22, 1995).  He said that the gunshots were fired into the ground.  Petitioner further testified,

"And I said this to myself like, you know, dang, you know -- which in other words I said

d—a—m—n -- but damn, you know, they might, you know, shoot me, you know, shoot me

because I felt, you know, they probably were thinking that I was shooting at them but I was not."

(Trial Tr. vol. V, 28, Sept. 22, 1995).

Petitioner testified that he jumped the fence because he thought that he would get rid of

the gun, but when he heard the shotgun blast his "lung gave up" and he froze, fell forward and

threw the gun.  (Trial Tr. vol. V, 29, Sept. 22, 1995).  He stated that he never made any threats to

the police, but did tell Sergeant Dieterle that he didn't mean to do it.  He said that his statement

to Sergeant Dieterle meant that he never meant to get this whole thing started.  Petitioner

testified that he did not intend to shoot the police officers.  In fact, he only remembered

discharging the gun three times, and he did not explain why the fourth shot was missing from his

gun.  Petitioner testified that his gun held nine bullets.

On cross examination, Petitioner admitted that he did say "shoot me, shoot me."  (Trial

Tr. Vol. V, 46, Sept. 22, 1995).  He stated that he didn't know he was being chased and never

saw any officers until he turned around.  Petitioner testified that he did think that Phillips might

be an undercover officer.

The jury found Petitioner guilty of two counts of Assault with Intent to do Great Bodily

Harm, and two counts of Assault with Intent to Commit Murder.


**III.  Standard of Review**

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs this

court's habeas corpus review of state court decisions.  Specifically, 28 U.S.C. § 2254(d) states in

pertinent part:

> (d) An application for a writ of habeas corpus on behalf of a person
> in custody pursuant to the judgment of a State court shall not be
> granted with respect to any claim that was adjudicated on the
> merits in State court proceedings unless the adjudication of the
> claim–
> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented at the
> State court proceedings.

Under (d)(1), a federal court may grant a writ of habeas corpus under two different

clauses, both of which provide two bases for relief.  Under the "contrary to" clause, a federal

court may grant habeas relief if the state court arrives at a conclusion opposite to that reached by

the Supreme Court on a question of law or if the state court decides a case differently than the

Supreme Court has decided on a set of materially indistinguishable facts.  *Williams v. Taylor*,

529 U.S. 362, 405-06 (2000).  The words "contrary to" should be construed to mean

"diametrically different, opposite in character or nature, or mutually opposed."  *Id.*

Under the "unreasonable application" clause, a federal court may grant habeas relief if

the state court identifies the correct governing legal principle from the Supreme Court's

decisions but unreasonably applies that principle to the facts.  *Williams*, *supra* at 407-08.  Relief

is also available under this clause if the state court decision either unreasonably extends or

unreasonably refuses to extend a legal principle from Supreme Court precedent to a new context.

*Id.* at 407; *Arnett v. Jackson*, 393 F.3d 681, 686 (6th Cir. 2005).  The proper inquiry for the

"unreasonable application" analysis is whether the state court decision was "objectively

13

unreasonable" and not simply erroneous or incorrect. *Williams*, *supra* at 407; *Lordi v. Ishee*, 384 F.3d 189, 195 (6th Cir. 2004).

In analyzing whether a state court decision is "contrary to" or an "unreasonable application" of clearly established Supreme Court precedent, a federal court may only look to the holdings, as opposed to dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision. *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003); *Williams*, *supra* at 412.

**IV.  Analysis**

  **A.  Sufficiency of the Evidence**

In his first claim for habeas corpus relief, Petitioner claims that the verdict was against the great weight of the evidence. After reviewing the argument in support of this claim, the Court construes this claim to be challenging the sufficiency of the evidence.

A federal court lacks power to grant habeas corpus relief on the ground that a state conviction is against the great weight of the evidence. *Thomas v. McLemore*, 2001 WL 561216, *5 (E.D. Mich. March 30, 2001), *citing Young v. Kemp*, 760 F.2d 1097, 1105 (11th Cir. 1985). The appropriate inquiry on federal habeas corpus review is not whether the verdict went against the great weight of the evidence, but whether sufficient evidence was presented to support the conviction. *Id.* Therefore, the Court shall consider only whether the verdict was supported by sufficient evidence.

In *Jackson v. Virginia*, 443 U.S. 307 (1979), the Supreme Court established that the standard of review for a sufficiency of the evidence challenge must focus on whether "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact

could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319

(emphasis in original). Pursuant to 28 U.S.C. § 2254(d)(1), this Court must determine whether

the state court applied the correct standard and whether that application was contrary to or an

unreasonable application of Supreme Court precedent. In making this determination, this Court

must afford the state court's findings of fact a presumption of correctness unless it is established

by clear and convincing evidence that the factual determination in the state court was erroneous.

28 U.S.C. § 2254(e)(1); *West v. Seabold*, 73 F.3d 81, 83 (6th Cir. 1996), *cert. denied*, 116 S. Ct.

2569 (1996).

The last state court to issue a reasoned opinion regarding this claim, the Michigan Court

of Appeals, held in pertinent part:

> First, defendant argues that the verdict was against the
> great weight of the evidence. An appellate court reviews the trial
> court's grant or denial of the motion for new trial for an abuse of
> discretion. *People v. Herbert*, 444 Mich 466, 477; 511 NW2d 654
> (1993).
>
> Determining whether a verdict is against the great weight
> of the evidence requires review of the whole body of proofs.
> *Herbert*, *supra* at 475. The test is whether the verdict is against
> the overwhelming weight of the evidence. *Heshelman v Lombardi*,
> 183 Mich App 72, 76; 454 NW2d 603 (1990). We give substantial
> deference to the court's finding that the verdict was not against the
> great weight of the evidence. *Severn v Sperry Corp*, 212 Mich
> App 406, 412; 538 NW2d 50 (1995). The issue of whether the
> conviction was against the great weight of the evidence usually
> involves matters of credibility or circumstantial evidence, *In re
> Robinson*, 180 Mich App 454, 463; 447 NW2d 765 (1989), but if
> there is conflicting evidence, the question of credibility should be
> left for the factfinder, *Rossien v Berry*, 305 Mich 693, 701; 9
> NW2d 895 (1943); see also *Whitson v Whitely Poultry Co*, 11
> Mich App 598, 601; 162 NW2d 102 (1968). We will not interfere
> with the jury's role of determining the credibility of witnesses.
> *People v McFall*, 224 Mich App 403, 412; 569 NW2d 828 (1997).

15

Defendant lists a number of "inconsistencies" in the witnesses' testimonies and relies on these differences in concluding that the jury's verdict was against the great weight of the evidence.  Defendant first states that there is a discrepancy about how many shots were fired and that this is important because each count charged against defendant originated from one of the shots.  The differences in the officers' testimonies are easily attributed to the fact that each officer involved in this fast-paced, stressful, armed chase had a slightly different perspective based on his view of each event, when he joined the chase, and his position in relation to the other officers and defendant.  These inconsistencies are not so overwhelming and insidious as to lead a jury or the court to the conclusion that these witnesses are to be afforded little or no credibility.  Accord *McFall*, *supra*.

Moreover, the fact that the jury differentiated between assault with intent to murder and assault with intent to do great bodily harm less than murder with respect to the officers who were threatened with "I'll kill you" and those who were not, is an important consideration.  The jury weighed the testimony and each officers' rendition of events and obviously found that the greater charge was merited only in two cases.  The court properly deferred to the jury's determination and, given the evidence in this case, did not abuse discretion in doing so.

Defendant also argues that if the jurors decided that defendant was guilty of assault with intent to murder as to Officer VanAlstine based on his testimony, then they had to reject Officer McKenna's testimony, and vice versa.  Accordingly, defendant concludes that defendant cannot be guilty of assault with intent to murder as to both McKenna and VanAlstine because each officer viewed the gunshot from the fence as directed toward him.  Defendant ignores, however, the testimony that during the chase, before defendant reached the fence, defendant fired at both officers while yelling, "you'll have to kill me, because I'm going to have to kill you," or some similar statement.  That particular incident could reasonably have been the basis for both counts of assault with intent to murder.  Additionally, when Officers McKenna and VanAlstine were at the fence, they were so close to each other that a shot toward one could easily have been directed simultaneously at either or both officers.  Defendant is attempting to make fine distinctions that counter the great wight of the evidence.

16

Therefore, the trial court properly found that the verdict
was not overwhelmingly against the great weight of the evidence.

*People v. Torbert*, No. 191426, slip op. at 1-2 (Mich.Ct.App. April 7, 1998).

This Court finds that well-reasoned disposition of Petitioner's sufficiency of the evidence

claim was neither contrary to nor or an unreasonable application of clearly established federal

law.  The Court of Appeals cited case law which plainly incorporated the *Jackson* standard, and

explained and supported its conclusion that a rational trier of fact could have found Petitioner

guilty beyond a reasonable doubt.  Therefore, no relief will be granted on this claim.

**B.  Denial of Voir Dire Claim and Claim IX–Exclusion of African-Americans on the
Jury**

Petitioner next asserts that he was denied a fair trial by the trial court's refusal to allow
his

counsel to conduct his own voir dire or to ask questions designed to probe whether prospective

jurors had any racial prejudices that would affect the verdict.  Petitioner argues that the trial

court's requirement that counsel provide handwritten questions when he had previously

submitted typed questions demonstrated hostility to counsel to voir dire.  Petitioner argues that

the fact that the jury verdict of the more serious convictions related to shot-at white police

officers and the lesser convictions related to black officers demonstrates racially motivated

verdicts.

In *Turner v. Murray*, 476 U.S. 28 (1986), the Supreme Court held that a trial judge must

question prospective jurors regarding racial bias in a case in which the jury is considering the

death penalty and the defendant requests such voir dire.  Further, as noted by the United States

17

Court of Appeals for the Sixth Circuit, the only "[c]ases in which the United States Supreme Court has required the opportunity for defense to voir dire on the issue of racial prejudice involved situations of extraordinary racial tension." *Daniels v. Burke*, 83 F.3d 760, 766 (6th Cir. 1996).

Here, the Court of Appeals found that race was not an issue inextricably bound up in the issues of the case. Petitioner was black. Two of the complaining police witnesses were black and two were white. There were black jurors. The trial court conducted voir dire on numerous issues giving sufficient information for intelligent challenges by counsel. And, when Petitioner's counsel was given the chance to re-submit questions on racial bias he declined to do so:

> The present case does not involve any special circumstance that would make race a bona fide issue. These facts do not even rise to the level of *Wray, supra*, where the defendant was of one race and the entire jury pool and witness list were of another. Defendant himself points out that at least two of the police witnesses were black and two were white and several jurors were black. Consequently, the trial court did not abuse its discretion in refusing to inquire about racial biases of the jurors. Additionally, the trial court carefully examined each potential juror with respect to whether any one had any contact with relatives or friends who had either been accused or convicted of some crime, and whether that experience tainted the juror's view of judges, courts, lawyers, police officers, or those accused of crimes. The court also questioned the jury venire about factors such as education, occupation and prior contact with anyone involved in the case. A thorough review of the trial court's voir dire reveals that the purpose of voir dire was, in fact, accomplished, and sufficient information was elicited so that the parties could make intelligent challenges.

> Defendant also complains that the trial court employed a " cumbersome procedure wherein he demanded that defense counsel write questions out in long hand in open court during the voir dire as a condition precedent to having the questions asked of the jurors." Defendant complains that he had already submitted his

18

questions in writing and that the irrationality of the court's procedure, combined with the trial court's "curious refusal" to order that the questions be made part of the record, creates the appearance that the court was deliberately making it difficult for the attorneys to participate in voir dire.  Defendant ignores the fact that when asked whether he had additional questions that should be asked, defense counsel, instead of submitting questions at that time, stated that he had already submitted his questions and would not repeat this effort.  Rather than avail himself of the opportunity to submit the questions that he deemed important about racial bias, defense counsel declined the invitation.

Consequently, the trial court did not abuse its discretion by refusing to allow defense counsel to conduct his own voir dire and by not asking questions that dealt with possible racial biases of the jurors.  The court correctly determined that race was not an issue "inextricably bound up" in the issues of the case, and ruled accordingly.

*Torbert*, *supra* at slip op. at 4-5.

Petitioner has failed to show that the decision of the Michigan Court of Appeals was an unreasonable application of Supreme Court law.  Petitioner has failed to make a showing that he is entitled to relief on the basis of lack of voir dire probing racial bias in this claim, and therefore is denied relief as to this claim.

Regarding the exclusion of African-Americans on the jury claim, Petitioner failed to challenge the jury composition at the time of selection.  The Court, nevertheless, in conducting its own *de novo* review, finds there was no factual basis for such a claim.  The trial court found in its ruling on Petitioner's motion for post-judgment relief:

Secondly, the facts belie defendant's assertion that the jury was not racially diverse.  Nine of the 63 were African-American. In addition, the issue of race was discussed during the direct appeal by defendant and the Court of Appeals specifically found that race was not present or the issue of race was not present in this case. Therefore, defendant does not prevail on this issue, for failing to raise the issue and preserve it in a timely fashion, and factually the

19

arguments are not supported by what actually happened in this
case.

Furthermore, this Court's review of the record demonstrates that the relevant
circumstances negate inferences of discrimination.  The prosecution did not question any of the
jurors in an unusual, distinct, or discriminatory manner nor did the prosecution make any
comments reflecting any bias or discriminatory intent.  The voir dire transcript indicates that the
prosecution had sufficient, non-discriminatory reasons to excuse the jurors in question.  Having
reviewed the state court record, this Court finds that the trial court's denial of relief on this claim
is neither contrary to United States Supreme Court precedent nor an unreasonable application
thereof.  Habeas relief is not warranted on this claim.


### C.  Jury Instruction Error Claim

In his third claim, Petitioner asserts that the was denied a fair trial by the trial court's
instruction to the jury that it was entitled to consider Petitioner's interest in the outcome of the
case when weighing Petitioner's testimony.  Petitioner concludes that the trial court thereby
impliedly indicated to the jury that he did not believe Petitioner's testimony.

Because the Michigan Court of Appeals  refused to review Petitioner's claim on the basis
that he failed to present it in accordance with state procedural rules and because he has failed to
establish cause and prejudice to excuse that procedural default, habeas review is barred.  Here
Petitioner failed to object to the complained-of jury instruction.

A state prisoner may not challenge the constitutionality of his conviction by seeking
habeas relief under 28 U.S.C. § 2254 unless he has exhausted his available state remedies.
*Coleman v. Thompson*, 501 U.S. 722, 731 (1991).  A state prisoner may not circumvent the

20

exhaustion requirement by failing to follow state procedural rules.  *See Gray v. Netherland*, 518 U.S. 152, 162 (1996); *Combs v. Coyle*, 205 F.3d 269, 274 (6th Cir. 2000).  In cases in which a state prisoner has defaulted his federal claims in state court, federal habeas review of the claim is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.  *Combs*, *supra* at 274.

The failure to properly raise and preserve issues in the trial court is a recognized and firmly established independent and adequate ground in Michigan for refusing to review trial errors.  *People v. Grant*, 445 Mich. 535, 546 (1994).  The United States Supreme Court has recognized that the failure to contemporaneously object is generally a recognized and firmly established independent and adequate state law ground for refusing to review trial errors. *Coleman*, *supra* at 750-751 (1991).

The Sixth Circuit has held that the failure of a criminal defendant to contemporaneously object constitutes a procedural default even through the matter was subsequently reviewed by an appellate court for manifest injustice.  *Paprocki v. Foltz,* 869 F.2d 281, 284-85 (6th Cir. 1989). Moreover, an alternative ruling by the state appellate court noting both lack of contemporaneous objection and lack of merit is still subject to the procedural default rule.  *Scott v. Mitchell*, 209 F.3d 854, 873 (6th Cir. 2000).

In this case, Petitioner has not alleged, much less established cause and prejudice to excuse this procedural default.  *Cone v. Bell*, 243 F.3d 961 (6th Cir. 2001).  Therefore, he is not entitled to habeas relief regarding this claim.

21

### D.  Prosecutor Misconduct Claim

In his fourth claim, Petitioner argues that the trial court erred in permitting the prosecutor to argue to the jury that it was people like defendant who made Flint a dangerous place. Specifically, Petitioner contends that the prosecutor's statement amounted to a plea for jurors to convict to do their civic duty and make Flint a safe place.  Petitioner asserts that the Michigan Court of Appeals' decision resulted in an objectively unreasonable application of clearly established Supreme Court precedent.

Petitioner's claim relates to the following portion of the prosecutor's argument:

> He admits to you that for coming to Flint he packs a weapon, a nine shot revolver.  He knows he shouldn't do it, but he tells you Flint's a dangerous place.  I think that's the most ironic thing I heard all–in this whole trial.
>
> Do you know why Flint's a dangerous place?  Because of people like him, people who decide I'm going to carry a gun.  And when cops are after you I'm going to run.  Well, you know why he runs; because he's got a gun.
>
> Flint's a dangerous place because you've got fools like this who shoot when they hear gunfire.  You've got running gun battles because of people like him who are walking around heavily armed.

*Torbert*, *supra* at 6.

Prosecutorial misconduct must be so egregious as to deny petitioner a fundamentally fair trial before habeas corpus relief becomes available.  *Donnelly v. DeChristoforo*, 416 U.S. 637, 643-45 (1974).  In this regard, "the touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor."  *Serra v. Mich. Dep't of Corr.*, 4 F.3d 1348, 1355

22

(6th Cir. 1993) (quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982)). Specifically, the Sixth

Circuit takes into account "the degree to which the remarks complained of have a tendency to

mislead the jury and to prejudice the accused; whether they are isolated or extensive, whether

they were deliberately or accidentally placed before the jury, and the strength of the competent

proof to establish the guilt of the accused." *Hamblin v. Mitchell*, 354 F.3d 484, 494-95 (6th Cir.

2003). "Claims of prosecutorial misconduct are reviewed deferentially on habeas review."

*Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004).

The inquiry is directed to deciding whether the state court's determination of the issue

was an unreasonable application of clearly established federal law. *Frazier v. Huffman*, 343 F.3d

780, 791 (6th Cir.), *as amended on reh'g*, 348 F.3d 174 (2003), *cert. denied*, 124 S.Ct. 1825

(2004); *United States v. Payne*, 2 F.3d 706, 715-16 (6th Cir. 1993) (inflammatory remarks in

opening and closing statements and throughout trial were not cured by cautionary instructions);

*United States v. Roberts*, 986 F.2d 1026, 1031 (6th Cir. 1993) (closing argument that appeals to

the community conscience was cured by instructions). The giving of cautionary instructions also

factors into the calculus of determining whether fundamental fairness was denied. *Serra*, *supra*

at 1356. Extensive prosecutorial misconduct during trial and during closing argument justifies

the granting of a writ of habeas corpus. *Boyle v. Million*, 201 F.3d 711, 717 (6th Cir. 2000).

However, where the evidence pointing to the defendant's guilt is strong and the

prosecutor's improper comments go to the nature and intent of the crime, not to the defendant's

guilt or innocence of the crime, the improper comments may be "error, but the jury would

probably have returned the verdict of guilty anyway," and habeas relief is not warranted.

*Hamblin*, *supra* at 495.

23

The Sixth Circuit has adopted a two-step approach in order to determine whether a defendant is entitled to a new trial based upon improper prosecutorial remarks made in closing argument.  *See United States v. Carroll*, 26 F.3d 1380, 1385-90 (6th Cir. 1994).  First, the court should determine whether the remarks were improper by examining the context of the remarks and existing precedent.  *Id.* at 1387-89.  Second, it should determine whether the remarks were flagrant by applying the factors enunciated in *United States v. Leon*, 534 F.2d 667, 678-83 (6th Cir. 1976).

> Flagrancy is determined by an examination of four factors: "1) whether the statements tended to mislead the jury or prejudice the defendant; 2) whether the statements were isolated or among a series of improper statements; 3) whether the statements were deliberately or accidentally before the jury; and 4) the total strength of the evidence against the accused."

*Id.  See also Boyle*, *supra* at 717 (quoting *Carroll*, *supra* at 549, 550).  "[T]o constitute the denial of a fair trial, prosecutorial misconduct must be 'so pronounced and persistent that it permeates the entire atmosphere of the trial,' or 'so gross as probably to prejudice the defendant."  *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997).

A prosecutor's comments in closing that appeal to the community sentiment to set the standard of justice in the community are permissible.  *Lorraine v. Coyle*, 291 F.3d 416, 445 (6th Cir. 2002).  A prosecutor's exhortation to a jury to send "a message to the community" and "the people in the community have a right to expect that you will do your duty" are "arguably proper general reference to the societal need to punish guilty people, rather than an improper 'attempt to compare or to associate the defendant with a feared and highly publicized group.'"  *Hicks v. Collins*, 384 F.3d 204, 219 (6th Cir. 2004).

Here, the Michigan Court of Appeals found there was no prosecutor misconduct.  The

24

prosecutor responded to Petitioner's theory of the case that it was so dangerous in Flint that he had to carry a gun for his own protection.  The prosecutor's comments did not inject issues beyond Petitioner's guilt or innocence.  The Michigan Court of Appeals found:

> Similarly, in the present case, the prosecution's comments were simply in response to defendant's theory of the case. Defendant had, in fact, testified that he carried a gun and that he did so for his own protection because Flint is a dangerous place. Defendant explained that he knew it was illegal to have the gun, and when the police approached him, he knew that he had to run because he was not allowed to be carrying a weapon.  Even if the prosecutor's comments rose to the level, as in *Bahoda*, where the prosecutor was commenting on the "pervasiveness" of the problem of violence in Flint because of those who carry guns, the state was not injecting issues beyond defendant's guilt or innocence. Moreover, the trial court's standard instruction that the jury must consider only the evidence and not the statements made by the lawyers in reaching its verdict would be sufficient to cure any minor prejudice that may have resulted from the prosecution's comments.

*Torbert*, *supra* at 6.

The prosecutor's comments did not directly or indirectly suggest a duty to convict to make the city safe.  Even if the prosecutor had appealed to the jury to set the standard of justice, that would have been proper argument.  Rather, the prosecutor expounded on Petitioner's belief that Flint was unsafe and the role that Petitioner played in this case in carrying a gun and firing at four police officers.  There was no prosecutor misconduct and there was no prejudice. The Michigan Court of Appeals' decision did not result in an objectively unreasonable application of federal as established by the United States Supreme Court.  A fair reading of the opinion of the state court reveals that it applied the appropriate constitutional test, and that it applied it to the facts of Petitioner's case in an ordinary fashion to reach a reasoned decision.

Moreover, even if error occurred, Respondent asserts that any such error cannot provide a

basis for granting habeas relief because it did not have a substantial influence or effect upon the determination of Petitioner's guilt at trial. *Brecht v Abrahamson*, 507 U.S. 619 (1993). The evidence offered against Petitioner at trial was overwhelming, and nothing about the alleged error would have reduced its considerable weight. That is, even had the error not occurred, there was no real chance that the result of the trial would have been any more favorable to Petitioner. *Hill v. Brigano*, 199 F.3d 833, 847 (6th Cir. 1999). Accordingly, Petitioner has not demonstrated entitlement to habeas relief with respect to this claim.


### E.  Judgment of Sentence Claim

In Petitioner's fifth claim, he asserts that the Michigan Department of Corrections is not interpreting the judgment of conviction in accordance with the trial court's intent. Petitioner argues that the trial court only intended to give him habitual offender status on the lesser sentences and not the greater sentences.

The fact that a state trial judge or agency may have incorrectly interpreted state law does not present grounds for granting habeas relief, and errors in the application of state law are not to be questioned in habeas courts. *Waters v. Kassulke*, 916 F.2d 329 (6th Cir. 1990); *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). Specifically, federal courts will not review on habeas corpus a state's failure to follow its own sentencing procedures. *Jones v. Estelle*, 622 F.2d 124 (5th Cir. 1980); *Bloyer v. Peters*, 5 F.3d 1093 (7th Cir. 1993).

Whether the Department of Corrections properly interpreted the trial court's order is a matter of state law and not the subject of habeas review. In any event the Michigan Court of Appeals found Petitioner was mistaken in his interpretation of the trial court's order of judgment

26

and the claim meritless.

The Michigan Court of Appeals found the Department of Corrections correctly followed the trial court's intent and judgment of sentence. The trial court could properly apply habitual status to some convictions and not others. Petitioner was factually mistaken in his belief that the Department of Corrections was not interpreting and executing the order of judgment. The Michigan Court of Appeals stated in pertinent part:

> Finally, defendant argues that this case should be remanded to correct the judgment of sentence that has been erroneously interpreted as applying habitual offender status to all of defendant's sentences instead of just the two lesser sentences to which the court intended it to apply. Defendant argues that his judgment of sentence should be corrected to reflect the fact that he is only an habitual offender with respect to the lesser sentences and not the greater. He states that the Department of Corrections has erroneously interpreted the judgment of sentence in a way that does not differentiate between the habitual offender and the non-habitual offender sentences. Defendant's reasoning, however, is erroneous.

> Defendant was sentenced as an habitual offender because he had previously committed another felony. The trial court had the authority and discretion, because of defendant's status as an habitual offender, to enhance his sentences or to impose a straight sentence from within the guidelines. The fact that the trial court chose to enhance the sentences with respect to the two lesser convictions and not with respect to the greater does not change defendant's status as an habitual offender. It is merely a reflection of the court's decision not to enhance his sentences. Accordingly, a remand for correction of the judgment of sentence is unnecessary.

*Torbert*, *supra* at 7.

The trial court applied habitual offender status to Counts I and IV, the assault with intent to commit great bodily harm convictions. Those were ten-year maximum offenses which were increased to fifteen-year terms. Originally the trial court mistakenly believed these assault

27

convictions had not been enhanced and declined to increase them further to a maximum of thirty-years.  The prosecutor pointed out that the sentences had been enhanced and the court acknowledged his intent to so sentence: "And I'll amend my comments and say that I'm taking the habitual then with respect to Count I and Count IV."  The trial court then sentenced Petitioner twenty to forty years each on the assault with intent to commit murder.  These charges have a maximum life sentence.

This Court agrees with the Michigan Court of Appeals' decision and finds that it is consistent with Supreme Court precedent and constitutes a reasonable application thereof. Accordingly, Petitioner is not entitled to habeas relief with respect to this claim.

### F.  Claims VI through XII

Respondent argues that Petitioner's claims VI through XII are procedurally defaulted, because he raised them for the first time in his post-conviction motion for relief from judgment and failed to show cause for failing to raise those issues in his appeal of right, as well as prejudice, as required by M.C.R. 6.508 (D)(3).  Petitioner contends that his appellate counsel was ineffective for failing to raise those claims in his appeal of right.  Ineffective assistance of counsel may establish cause for procedural default.  *Edwards v. Carpenter*, 529 U.S. 446, 451-52 (2000).

If petitioner could show that he received ineffective assistance of appellate counsel that rose to the level of a Sixth Amendment violation, it would excuse his procedural default for failing to raise his claims on his direct appeal in the state courts.  *Seymour v. Walker*, 224 F. 3d 542, 550 (6th Cir. 2000).  Given that the cause and prejudice inquiry for the procedural default

28

issue merges with an analysis of the merits of Petitioner's defaulted claims, it would be easier to consider the merits of these claims. *See Cameron v. Birkett,* 348 F. Supp. 2d 825, 836 (E.D. Mich. 2004). Additionally, Petitioner could not have procedurally defaulted his ineffective assistance of appellate counsel claim, because state post-conviction review was the first opportunity that he had to raise this claim. *See Hicks v. Straub*, 377 F. 3d 538, 558, n. 17 (6th Cir. 2004); *Johnson v. Warren,* 344 F. Supp. 2d 1801, 1089, n. 1 (E.D. Mich. 2004).

In this case, because "the procedural default issue raises more questions than the case on the merits," this Court will assume, for the sake of resolving the claims, that there is no procedural default by Petitioner and will decide the merits of the claims. *Falkiewicz v. Grayson,* 271 F. Supp. 2d 942, 948 (E.D. Mich. 2003)(internal quotation omitted).

Procedural default is not a jurisdictional bar to a review of the merits of a habeas petition. *See Howard v. Bouchard*, 405 F.3d 459, 476 (6th Cir. 2005) (citing *Trest v. Cain*, 522 U.S. 87, 89 (1997)). Consequently, a federal court is not required to address a procedural default issue before ruling against a habeas petitioner on the merits of his claims. When a procedural default issue presents a more complicated question and is unnecessary to the disposition of the case, a court may proceed directly to the merits of the petitioner's claims in the interest of judicial economy. *See Lambrix v. Singleterry*, 520 U.S. 518, 525 (1997); *Hudson v. Jones*, 351 F.3d 212, 215-16 (6th Cir. 2003); *Johnson v. Warren*, 344 F. Supp. 2d 1081, 1089 (E.D. Mich. 2004); *see also Strickler v. Green*, 527 U.S. 263, 282 (1999) (considering merits of habeas claims where such inquiry mirrored procedural default cause and prejudice inquiry); *see also Cameron v. Birkett*, 348 F. Supp. 2d 825, 836 (E.D. Mich. 2004) (same).

In the present case, resolving the procedural default issue will be more complex than

deciding the substantive claims on habeas review and will require some consideration of the merits of those claims. Accordingly, in the interests of judicial economy, the Court will address the merits of Petitioner's habeas claims without ruling on the procedural default issue.

**1. Actual Innocence Claim–Claim VI.**

Respondent contends that Petitioner has asserted his actual innocence claim in order to avoid his procedural defaults. Although this Court agrees with Respondent, the Court will address the claim.

"A claim of actual innocence based upon newly discovered evidence is not grounds for federal habeas relief." *Hence v. Smith*, 37 F. Supp. 2d 970, 980 (E.D. Mich 1999). "[F]ederal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution, not to correct errors of fact." *Herrera v. Collins*, 506 U.S. 390, 400 (1993). A claim that a habeas petitioner is entitled to relief based upon the failure of a state trial judge to grant him a trial on the basis of newly discovered evidence is not cognizable in a habeas proceeding. *Monroe v. Smith*, 197 F. Supp. 2d 753, 763 (E.D.Mich. 2001). A petitioner's claim that he has newly discovered evidence of his innocence does not state a claim upon which habeas relief can be granted. *See Johnson v. Hofbauer,* 159 F. Supp. 2d 582, 606 (E.D. Mich. 2001). Additionally, even those federal courts that have suggested that habeas relief could conceivably be granted upon newly discovered evidence have set an extraordinary showing of a petitioner's innocence before habeas relief could be granted. *Dell v. Straub,* 194 F. Supp. 2d 629, 657 (E.D. Mich. 2002); *Johnson v. Hofbauer,* 159 F. Supp. 2d at 606 (collecting cases).

Here, Petitioner argues that he is actually innocent because of his interpretation of the

trial proofs.  Petitioner argues it was impossible for him to have committed the crimes because of the inconsistent testimony of the police officers as to the number of shots Petitioner fired and the number of spent and live bullets that the officers determined came from his gun.  Simply stated, that is not new evidence.  Petitioner is not entitled to habeas relief on this claim.

### 2.  Denial of Right to Present a Defense–Claims VII and VIII

Petitioner claims entitlement to habeas relief because the police failed to discover and investigate witnesses who would have provided meaningful assistance to him in this case. Petitioner asserts this evidence was relevant, and its exclusion denied him his right to present a defense.

"A fair opportunity to present a defense is a constitutional right," *Baze v. Parker*, 371 F.3d 310, 323 (6th Cir. 2004) (citing *Crane v. Kentucky*, 476 U.S. 683, 690 (1986), *petition for cert. filed* (U.S. Jan. 25, 2005) (No. 04-8376)), and "presenting relevant evidence is integral to that right." *Id.* (citing *Taylor v. Illinois*, 484 U.S. 400, 408-09 (1988)).  It is one of the "minimum essentials of a fair trial." *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973).  The Supreme Court has described the "most basic ingredients of due process of law" as follows"

> A person's right to reasonable notice of a charge against him, and
> an opportunity to be heard in his defense–a right to his day in
> court–are basic in our system of jurisprudence; and these rights
> include, as a minimum, a right to examine the witnesses against
> him, to offer testimony, and to be represented by counsel.

*Washington v. Texas*, 388 U.S. 14, 18 (1967) (quoting *In re Oliver*, 333 U.S. 257 (1948)).

Further, the Supreme Court described the right to present a defense as follows:

> The right to offer testimony of witnesses, and to compel their
> attendance, if necessary, is in plain terms the right to present a

31

> defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

*Id.*

This right, however, is not absolute and "[s]tates have broad authority to promulgate rules that exclude evidence so long as they are not arbitrary or disproportionate to purposes they are designed to serve." *Id.* (quoting *United States v. Scheffler*, 523 U.S. 303, 308 (1998)). The exclusion of evidence is unconstitutional where it "infringe[s] upon a weighty interest of the accused." *Id.* (citing *Rock v. Arkansas*, 484 U.S. 44, 58 (1987)).

In determining whether the exclusion of evidence infringes upon a weighty interest of the accused, the court's role is not to determine whether the excluded evidence would have caused the jury to reach a different result. *Davis v. Alaska*, 415 U.S. 300, 317 (1973). Instead, the question is whether the defendant was afforded "'a meaningful opportunity to present a complete defense.'" *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)). The prosecutor's case must "encounter and 'survive the crucible of meaningful adversarial testing.'" *Id.* at 690-691 (quoting *United States v. Cronic*, 466 U.S. 648, 656 (1984)).

Petitioner has not made a proper showing as to which witnesses would have been helpful to his defense. The trial court in issuing its ruling on Petitioner's motion for post-judgment relief stated:

32

> [W]hat defendant cannot show is prejudice. Defendant cannot point to any particular witness or class of witnesses who would have provided meaningful assistance to him in this case. In large part this issue goes back to defendant's claim with respect to the weight of the evidence against him and that issue has already been decided against the defendant in his direct appeal.
>
> And I would make this observation as well: as far as identifying individuals who might be present when this incident occurred, defendant, more so than the police officers, was in position to know the identity of some of the individuals.
>
> * * *
>
> I think what I said in response to Issue One [Habeas Claim VII] has some applicability here. There must be a showing of need. Defendant did not show need in this case. I presume defendant had knowledge of individuals who were present, at least at the beginning part of the incident involving the defendant and the police officers. Nowhere is there a claim that Witness X, Y, and/or Z were not produced or were not investigated. Defendant is talking about finding slugs in the ground; and again, the specific necessary to require the appointment of an investigator were not presented during the motion.

*See* Ruling on Defendant's Motion for Relief from Judgment, Nov. 18, 2002.

As such, the excluded evidence did not impinge upon Petitioner's right to present a defense. The trial court's determinations were not contrary to, or an unreasonable application of, clearly established United States Supreme Court precedent. Habeas relief shall be denied on this claim.

### 3. Ineffective Assistance of Counsel Claims–Claims X and XI.

In these claims, Petitioner alleges that he was deprived of the effective assistance of trial and appellate counsel. Those claims were presented to the state court on Petitioner's motion for

33

relief from judgment.

To show that he was denied the effective assistance of counsel under federal constitutional standards, a petitioner must satisfy a two prong test. First, a petitioner must demonstrate that, considering all of the circumstances, counsel's performance was so deficient that the attorney was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In so doing, a petitioner must overcome a strong presumption that counsel's behavior lies within the wide range of reasonable professional assistance. *Id*. In other words, a petitioner must overcome the presumption that, under the circumstances, the challenged action might be sound trial strategy. *Strickland, supra* at 689. Second, a petitioner must show that such performance prejudiced his defense. *Id*. To demonstrate prejudice, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland, supra* at 694. The *Strickland* standard applies as well to claims of ineffective assistance of appellate counsel. *See Whiting v. Burt,* 395 F. 3d 602, 617 (6th Cir. 2005).

Here, Petitioner initially contends that he was constructively denied the assistance of counsel at trial, because his trial attorney failed to conduct a thorough investigation.

The Sixth Circuit in *O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994) held that a failure to investigate, especially as to key evidence, must be supported by a reasoned and deliberate determination that investigation was not warranted. In this case, the trial court reasoned:

Once again, with respect to this issue, much of defendant's argument is a recapitulation of his continuing claim that the

34

evidence was insufficient to convict him of these charges. And, once again, as I would note in my earlier comments with respect to several of the issues raised by the defendant, the question must be asked: did defendant ever come forward and say that, "I know the names of witnesses who were present. Please find these individuals?" He never came forward to say that, "I fired a gun in the ground at this exact location." And so much of what defendant is claiming his counsel did not do, his counsel could not do without information from the defendant. And, again, saying that "I fired a bullet into the ground near this location; go find it, "is not something that is reasonable to expect an attorney to be able to do. In addition, there is not testimony other than defendant's to support any such claim.

\* \* \*

The errors that are specifically pointed to by defendant, even if true, are not so serious as to compel a finding that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment. Defendant cannot show by virtue of his claimed ineffective conduct that any of that was prejudicial to defendant. He cannot show that the deficiencies, if they existed at all, were such as to deprive the defendant of a trial whose result is reliable.

*See* Ruling on Defendant's Motion for Relief from Judgment, Nov. 18, 2002. The trial court's decision is not an unreasonable application of or contrary to federal law, and therefore, Petitioner is not entitled to habeas relief on this claim.

The Court will likewise reject petitioner's ineffective assistance of appellate counsel claim. The Sixth Amendment guarantees a defendant the right to the effective assistance of counsel on the first appeal by right. *Evitts v. Lucey*, 469 U.S. 387, 396-97 (1985). However, court appointed counsel does not have a constitutional duty to raise every nonfrivolous issue requested by a defendant. *Jones v. Barnes*, 463 U.S. 745, 751 (1983). An attorney's failure to present a nonmeritorious issue on appeal does not constitute ineffective assistance of counsel. *See Harris v. Stegall,* 157 F.Supp. 2d 743, 747 (E.D.Mich. 2001).

35

2:05-cv-71543-DPH-RSW   Doc # 33   Filed 10/31/06   Pg 36 of 36   Pg ID 1610

Because Petitioner's underlying claims are without merit, appellate counsel was not ineffective for failing to raise those claims in Petitioner' appeal of right.

**V.  Conclusion**

For the reasons stated above, this Court concludes that Petitioner is not entitled to federal habeas relief on the claims presented in his petition.

Accordingly:

**IT IS ORDERED** that the petition for writ of habeas corpus is **DENIED WITH PREJUDICE**.

s/ DENISE PAGE HOOD
Denise Page Hood
United States District Judge

Dated: October 31, 2006

I hereby certify that a copy of the foregoing document was served upon counsel of record on October 31, 2006, by electronic and/or ordinary mail.

S/William F. Lewis
Case Manager